ANITA SCHANBACK, Respondent, v MARTIN SCHANBACK, Appellant.

Second Department, October 5, 1987

### APPEARANCES OF COUNSEL

*Raoul Lionel Felder* and *Booth, Lipton & Lipton (Myrna Felder* of counsel), for appellant. (One brief filed.)

*Bushkin, Gaims, Gaines, Jonas & Stream (Arnold C. Stream* of counsel; *Lawrence B. Trachtenberg* on the brief), for respondent.

*Michael Colodner (Patricia P. Satterfield* of counsel), for Chief Administrative Judge of the Unified Court System of the State of New York, *amicus curiae.*

### OPINION OF THE COURT

MOLLEN, P. J.

The issue which must be determined in the first instance on this appeal is whether an equitable distribution matter may be referred, over the objections of both parties, to a Judicial Hearing Officer to hear and determine the economic issues to be resolved between the parties to a matrimonial action. The Supreme Court, Nassau County, ruled that such a matter constituted an "examination of a long account" within the meaning of CPLR 4317 (b) and was thus the proper subject for a compulsory reference to a Judicial Hearing Officer. We disagree, and accordingly reverse the judgment, insofar as appealed from, and remit the matter for further proceedings consistent herewith.

I

The relevant facts in the case are not in dispute. The

parties were married on December 6, 1952, in New York City. The parties' three children, all of whom are now emancipated, were born in 1955, 1957 and 1961, respectively. In March 1982, the plaintiff, Anita Schanback, commenced this action against the defendant, Martin Schanback, for a divorce on the ground of abandonment. In October 1982, the plaintiff sought and subsequently obtained a pendente lite order directing the defendant to pay temporary maintenance to the plaintiff in the amount of $1,500 per month and to pay all of the carrying charges on the marital residence located in Hewlett Harbor, New York.

On April 8, 1985, the parties appeared with counsel before the then Administrative Judge of Nassau County. In response to the court's inquiry, the parties' respective counsel estimated that given the number and complexity of the issues and the assets involved, a trial on the economic issues would last approximately 3½ weeks. In view of the length of time involved, the Administrative Judge recommended that the parties consent to a reference of the economic issues to a Judicial Hearing Officer for resolution. Both parties refused to consent.

Despite the parties' refusal to consent, the Administrative Judge orally directed that the economic aspects of the divorce action be heard and determined by a Judicial Hearing Officer. The court stated, *inter alia,* as follows:

"Without the consent of the parties I now rule that based upon the * * * section [CPLR 4317 (b)], entitled 'Without the Consent of the Parties,' [which] reads 'on its initiative the Court may order a referee to determine a cause of action or issue *where the trial will examine the examination of a long account'* * * *

"In my view, Counsel, an extended equitable distribution case is the classic case to go to a judicial hearing officer. It involves complex financial issues, listening to expert witnesses and multiple figures and is what the law envisions when the statutes were amended to include a judicial hearing officer as a referee" (emphasis supplied).

The plaintiff's counsel objected to the court's ruling on the basis that the equitable distribution case did not constitute a "long account" under CPLR 4317 (b). The plaintiff's counsel also argued that the statute, as construed, was unconstitutional.

By order dated April 9, 1985, the Administrative Judge

effectively severed the economic issues and demands for relief from the cause of action for a divorce and referred those economic issues to a Judicial Hearing Officer to hear and determine.

On April 25, 1985, the plaintiff was granted a judgment of divorce. On that same date, the trial of the economic issues commenced before a Judicial Hearing Officer. At the commencement of the hearing, the defendant's counsel registered her objection to the reference of the case to a Judicial Hearing Officer.

Much of the testimony and evidence adduced at the hearing, which lasted over one month, concerned the defendant's interest in two corporations, namely, Friendship Dairies, Inc. and Friendship Food Products, Inc., which engaged in the manufacture and distribution of dairy products. The defendant had owned 50% of the outstanding stock of Friendship Dairies, Inc. prior to the parties' marriage in 1952. Five days after the parties' marriage, Friendship Food Products, Inc. was formed for the purpose of distributing the products of Friendship Dairies, Inc. At the time of the hearing, the defendant owned 14,997 of the shares in Friendship Dairies, Inc. and 13,297 of the shares in Friendship Food Products, Inc. Evidence was also adduced concerning many other assets owned by one or both of the parties, including the marital residence, stocks and bonds, real estate interests in Florida, mortgages, limited partnerships, jewelry and furs. Each party also owned an interest in a pension plan.

Following the hearing, the Judicial Hearing Officer issued a lengthy opinion in which she summarized the testimony and evidence presented, made factual findings and rendered conclusions of law. The total value of the parties' marital property was determined to be $5,807,120; that sum included the appreciation in value of the defendant's separate property interests in the Friendship companies which occurred during the parties' marriage. The plaintiff was awarded 40% of the appreciated value of the defendant's business interest and was also awarded 50% of the value of the parties' remaining marital assets. The distributive award totaled $2,517,860. The distribution was to be implemented by awarding the plaintiff the marital residence together with its furniture and furnishings, her jewelry and furs, her pension, $113,711 in securities, and a cash award of $1,827,628 to be paid over a five-year period. The record does not indicate that tax consequences were considered by the Judicial Hearing Officer with respect

to the distributive award. The plaintiff was also awarded counsel fees in the amount of $26,514. The Judicial Hearing Officer declined to award any maintenance to the plaintiff, in view of the fact that she was currently employed, had been awarded the marital residence and was to receive a sizable cash distributive award.

In her written opinion, the Judicial Hearing Officer also addressed the parties' objections to the compulsory reference. The Judicial Hearing Officer was in agreement with the Administrative Judge's reasoning that the reference to determine was proper pursuant to CPLR 4317 (b) since the matter required an "examination of a long account" within the meaning of the statute, and thus the parties' consent was not required. She further stated, *inter alia:*

"The use of Judicial Hearing Officers in matrimonial actions envisions long and detailed examination and cross-examination to determine valuations of both marital and separate property. Compulsory reference is necessary and proper where it is evident that the matter involves intricate and complex details of financial dealings, resources and equities. Significantly, some of the major issues presented in this hearing involve the questions of the valuation of: (a) closely held corporations; (b) pension plans; (c) tax shelters; (d) mortgage and real estate holdings; (e) personalty and (f) stock and bond portfolios.

"Plaintiff submitted approximately 190 exhibits in regard to the above issues, while defendant countered with exhibits A through VV. Indeed the records submitted in evidence had to be wheeled into court on a dolly * * *

"The determination of valuation is not incidental to this action but the very heart of the judgment on the financial issues. The dispute is evident by the wide area of disagreement between the experts in regard to every aspect of the parties' divergent property. The contentions encompass not only a multimillion dollar enterprise but even the value of the dinner service purchased by the parties on their honeymoon some 34 years ago".

The Judicial Hearing Officer also ruled that the statute, as construed, was constitutional.

A judgment (improperly designated an order) dated February 25, 1986, was entered on the Judicial Hearing Officer's determination. On March 14, 1986, a final judgment of divorce was awarded to the plaintiff. The defendant has appealed from

the judgment dated February 25, 1986, a major contention being that the compulsory reference to a Judicial Hearing Officer was not authorized by statute.

## II

Initially, a brief discussion of the historical background of Judicial Hearing Officers is warranted.

Prior to 1962, two classes of Referees existed, namely, Official Referees and nonofficial Referees. Official Referees, who were the forerunners of today's Judicial Hearing Officers, were retired Justices of the Supreme Court, retired Judges of the Court of General Sessions of the County of New York and retired County Judges and Surrogates (see, Judiciary Law former § 116). Under the then existing legislative framework, only an Official Referee could be designated by a court to determine an issue in a matrimonial action (see, former Civ Prac Act § 1174). The purpose of this rule was to prevent collusive matrimonial actions whereby the parties would nominate a "friendly" Referee in order to circumvent matrimonial laws (see, Cunningham and Sullivan, Practice Commentary, McKinney's Cons Laws of NY, Book 7B, CPLR 4312, at 184). In addition to references on consent, Judiciary Law former § 116 permitted the reference of any issue in a matrimonial action to an Official Referee for determination without the consent of the parties (see, Matter of Brock, 245 App Div 5; Gossin v Gossin, 188 Misc 1).

In 1962, the office of Official Referee was abolished by an amendment to the State Constitution (see, NY Const, art VI, § 35). At that same time Judiciary Law former § 116 was repealed, thus eliminating the statutory authorization for compulsory references to determine matrimonial actions. These revisions to the statutory scheme effectively ended the ability to designate new Official Referees. However, a new section 116 of the Judiciary Law was adopted providing that then existing Official Referees could continue in office for the remainder of the terms for which they were appointed or certified (L 1962, ch 704, § 2). When the CPLR took effect in 1963, it contained provisions relating to Official Referees so as to provide, for example, those persons who still held the office of Official Referee with authority to act in matrimonial actions (CPLR former 4312 [2]; Judiciary Law § 117; see also, CPLR former 4313, 4315).

The present Judicial Hearing Officer program was instituted

in 1983, primarily based on the recommendations of the Committee to Utilize the Services of Retired Judges (hereinafter the Committee) which was created by the then Chief Administrative Judge. The objective of the Committee was to consider the possible use of the State's retired Judges to assist in alleviating the increasing problems of calendar congestion and delay in the State judicial system (see, Report of Comm to Utilize Servs of Retired Judges, at 1). The Committee's final report to the Chief Administrative Judge contained the following four proposals:

"1) A new position of Judicial Hearing Officer should be created in the judicial system;

"2) Judicial Hearing Officers should be selected from the ranks of retired judges who have presided in courts of record and who are certified as mentally and physically able to perform the services of this new position;

"3) Judicial Hearing Officers should be used in both civil and criminal cases:

"(i) *Civil Cases:* To serve in all matters in which referees are presently permitted by the CPLR;

"(ii) *Criminal Cases:* To hear and report on pre-trial matters and to hear and determine minor criminal matters; and

"4) Judicial Hearing Officers should be paid by the State through a budget of the Office of Court Administration" (Report of Comm to Utilize Servs of Retired Judges, at 1-2).

The Committee noted that its recommendations could be implemented with fairly minor legislative and administrative changes since the Referee system under CPLR article 43 was already in place. The essential element that the Committee suggested be added to the existing legislative framework was State-paid compensation since it determined that the courts were generally reluctant to use Referees due to the requirement that the parties bear the expense of the Referee.

In 1983, the Judiciary Law, the CPLR, the CPL and the Retirement and Social Security Law were amended in order to implement the Committee's recommendations (see, L 1983, ch 840; 1983 NY Legis Ann, at 362). Specifically, article 22 was added to the Judiciary Law to provide for the designation and compensation of Judicial Hearing Officers (see, Judiciary Law § 850 et seq.). In regard to civil actions, various sections of the CPLR were amended to incorporate Judicial Hearing Officers in all of the provisions relating to Referees (see, CPLR 105, 3104, 4301, 4312, 4313, 4315, 4321, 7804, 8003). CPLR 4301

was amended to provide that "[f]or the purposes of this article, the term referee shall be deemed to include judicial hearing officer". CPLR 4312, 4313 and 4315 were also amended to substitute the term "judicial hearing officer" for "official referee". Significantly, the Legislature did not enact specific legislation empowering Judicial Hearing Officers to hear and determine issues in matrimonial actions *without* the parties' consent. Accordingly, in civil actions and proceedings, a Judicial Hearing Officer, with few exceptions *(see, e.g.,* CPLR 4312 [1], [2]), possesses the identical power and authority as a Referee *(see, Lipton v Lipton,* 128 Misc 2d 528, 530, *affd* 119 AD2d 809).

## III

We now consider the issue at hand, namely, whether a compulsory reference of an equitable distribution matter to a Judicial Hearing Officer is authorized by CPLR 4317 (b). CPLR 4317, in its entirety, provides as follows:

"(a) *Upon consent of the parties.* The parties may stipulate that any issue shall be determined by a referee. Upon the filing of the stipulation with the clerk, the clerk shall forthwith enter an order referring the issue for trial to the referee named therein. Where the stipulation does not name a referee, the court shall designate a referee. Leave of court and designation by it of the referee is required for references in matrimonial actions; actions against a corporation to obtain a dissolution, to appoint a receiver of its property, or to distribute its property, unless such action is brought by the attorney-general; or actions where a defendant is an infant.

"(b) *Without consent of the parties.* On motion of any party or on its own initiative, *the court may order a reference to determine a cause of action or an issue where the trial will require the examination of a long account,* including actions to foreclose mechanic's liens; or to determine an issue of damages separately triable and not requiring a trial by jury; or where otherwise authorized by law" (emphasis added).

CPLR 4312 (2) also provides, *inter alia,* "[i]n matrimonial actions, only a judicial hearing officer or a special referee appointed by the chief administrator of the courts may be designated to determine an issue".

It is clear that a Judicial Hearing Officer has the authority and power to hear and determine equitable distribution matters such as that at bar upon the parties' consent *(see,* CPLR

4317 [a]; 4312 [2]). The question of whether the same authority exists if the parties do not consent centers upon the issue of whether such a matter constitutes an "examination of a long account" (CPLR 4317 [b]).

References of actions on "long accounts" date as far back as the days of Dutch rule in the New Amsterdam colony, when such references were quite common (see, Steck v Colorado Fuel & Iron Co., 142 NY 236, 238). After the acquisition of the colony by the British, the references were no longer permitted and it was provided "that all trials shall be by [a] verdict of twelve men" (Steck v Colorado Fuel & Iron Co., supra, at 238). It eventually became apparent that the courts were becoming overburdened with cases, particularly between merchants, involving voluminous records and accounts which were difficult for a jury to understand and resolve. As a result, in 1768, an act was passed to permit the compulsory reference of these types of actions involving "long accounts" (see, Hemmerich v City of Geneva, 251 App Div 105, 106; Starace v Cimenti, 75 Misc 2d 668, 669). This statute has existed in one form or another since that time (see, Steck v Colorado Fuel & Iron Co., 142 NY 236, 238, supra; Glass v Thompson, 51 AD2d 69). Its purpose is to permit the removal of "complicated and intricate issues of fact * * * from an ordinary court and jury so that such issues may be more effectively and expeditiously determined in a hearing before a person specifically qualified by expertise and competence to deal with the area in question" (Glass v Thompson, supra, at 76).

The term "long account" has been defined as "an account for work and labor or services running over a long period, in account for goods sold and delivered consisting of many items, or * * * advances of money" (8 Carmody-Wait 2d, NY Prac § 61:14, at 469). In order for a matter to be considered a "long account" subject to a compulsory reference, the issues must be so numerous and tedious that it would be impossible for a jury to resolve them within the reasonable time limits of a trial and primarily present an issue of appropriate computation (see, Feeter v Arkenburgh, 147 NY 237; Brooklyn Pub. Lib. v City of New York, 240 NY 465; City of Poughkeepsie v Poughkeepsie Associated Fire Dept., 125 AD2d 522, 523; Sheean v Allen, 19 AD2d 595; Longo v Adirondack Drilling, 14 AD2d 476; Thibaudeau v City of Niagara Falls, 239 App Div 644). Additionally, it must be shown that the account to be examined is the immediate object of the action or ground of defense; it must be directly and not merely collaterally or

incidentally involved *(see, Camp v Ingersoll,* 86 NY 433). Generally speaking, however, the courts have demonstrated reluctance in ruling that a matter constitutes a "long account" subject to a compulsory reference merely on the basis that lengthy financial calculations are involved. This reluctance stems primarily from the understanding that a litigant should not readily be deprived of his or her constitutional right to trial by jury *(see, Thibaudeau v City of Niagara Falls, supra,* at 646; *Starace v Cimenti,* 75 Misc 2d 668, 669, *supra).* Thus, the use of compulsory references has been limited to those very exceptional cases where, as described above, "the 'account' is so long and detailed that a jury would find great trouble in resolving it" *(Longo v Adirondack Drilling,* 14 AD2d 476, 477, *supra).*

In the case at bar, it is apparent at the outset that some of the matters to be resolved in an equitable distribution case might be deemed to resemble an examination of a "long account". A marriage has been characterized, among other things, as an "economic partnership" *(O'Brien v O'Brien,* 66 NY2d 576, 585) which upon its dissolution necessitates "a winding up of the parties' economic affairs and a severance of their economic ties by an equitable distribution of the marital assets" *(O'Brien v O'Brien, supra,* at 585).

Fundamental differences, however, exist between the type of issues to be resolved in an equitable distribution matter and those traditionally involved in "examination[s] of a long account" (CPLR 4317 [b]). In the first instance, the "winding up" process in equitable distribution requires the resolution of many complex legal and financial issues, including the identification, valuation, allocation and distribution of the marital assets, which, as in the case before us, involve closely held corporations, real estate, mortgages, securities, jewelry and pensions. Unlike an account for goods sold, work performed or money advances, the distributive award to which a spouse is entitled out of the marital assets under the Equitable Distribution Law cannot be determined by reference to a contractual or mathematical formula, but rather requires the exercise of the court's discretion and judgment involving, in many instances, complex issues of law. For example, once the parties' various assets are identified, the court is called upon to determine which of the assets are "marital property" as opposed to "separate property" (Domestic Relations Law § 236 [B] [1] [c], [d]). Such a determination is made not only by applying the relevant factors outlined in the statute *(see,*

Domestic Relations Law § 236 [B] [1] [c], [d]), but also may involve careful consideration of the direct or indirect contributions and efforts that the nontitled spouse may have made toward the appreciation of separate property and a determination as to what percentage of that appreciation constitutes marital property (see, Price v Price, 69 NY2d 8).

Following the identification of the marital property, the court must exercise its discretion to select a valuation date for each asset which would be appropriate in light of the particular circumstances of the case and consistent with the legislative mandate to provide equity in distributing the assets of the marital partnership (see, Wegman v Wegman, 123 AD2d 220). Before determining the percentage of the marital property each spouse is entitled to and arriving at the actual distribution, the court is then called upon to consider many factors, including, but not limited to the duration of the marriage and the age and health of both parties (Domestic Relations Law § 236 [B] [5] [d] [2]), the need of the custodial parent to occupy the marital residence (Domestic Relations Law § 236 [B] [5] [d] [3]), whether or not there was a wasteful dissipation of assets by either spouse (Domestic Relations Law § 236 [B] [5] [d] [11]), and the tax consequences to each party (Domestic Relations Law § 236 [B] [5] [d] [10]). In rare cases, the court may even consider, in its discretion, the marital fault of a party in making a distributive award (see, Blickstein v Blickstein, 99 AD2d 287, appeal dismissed 62 NY2d 802). Finally, after a careful balancing of all of these factors, the court is required to distribute the marital property, not necessarily equally or by reference to a predetermined formula, but equitably in view of the circumstances of the case and of the relative positions of the parties (see, Domestic Relations Law § 236 [B] [5] [c]).

Another distinguishing factor between "long accounts" and equitable distribution cases is that in addition to the question of how the parties' marital property should be distributed, the court must also address the issue of whether a particular spouse is entitled to maintenance (see, Domestic Relations Law § 236 [B] [6]). This issue clearly does not involve an "examination of a long account" (CPLR 4317 [b]), since it requires the court to not only give consideration to the value of the parties' marital assets, but more particularly to also contemplate a number of intangible factors, such as the earning capacity of both parties, the ability of the party seeking maintenance to become self-supporting, and the financial responsibilities of

the other party *(see,* Domestic Relations Law § 236 [B] [6] [a] [1]-[11]).

It is beyond cavil that the exercise of discretion required in the resolution of the issues involved in equitable distribution actions far exceeds the bounds of an "examination of a long account" (CPLR 4317 [b]) which, as stated above, has been traditionally limited basically to matters concerning mathematical calculations, i.e., debits, credits, receipts and payments. The impropriety of referring these matters to a Judicial Hearing Officer for resolution over the parties' objection is underscored by the importance of the issues to the parties involved, particularly in the absence of statutory authority. Unlike the disposition of purely commercial type transactions, the parties' entire lives are significantly affected by the manner in which these issues are resolved.

Moreover, the fact that the parties to an equitable distribution matter are not entitled to a jury trial on these issues does not warrant a different result. Absent statutory authority to the contrary or the consent of the litigants, the parties in these actions have a right to have a Supreme Court Justice resolve these equitable distribution issues irrespective of the fact that their resolution may require lengthy and detailed testimony and evidence and consume a great deal of the court's time *(see, Clark v Garth,* 67 Misc 2d 473, 477). Thus, since equitable distribution actions cannot be reasonably characterized as "examination[s] of a long account" (CPLR 4317 [b]), and no specific statutory authority exists to permit a Judicial Hearing Officer to hear and determine these actions over the parties' objections, the compulsory reference in the case at bar was inappropriate.

We note that in support of the contrary position that Judicial Hearing Officers can determine equitable distribution issues in a compulsory reference, the *amicus curiae* brief submitted on behalf of the Chief Administrative Judge places great emphasis on the fact that the Governor's approval memorandum in support of the bill implementing the Judicial Hearing Officer program states, in part, "[u]nder the bill, a judicial hearing officer will be empowered to serve as a referee in civil matters, *including matrimonial actions"* (Governor's approval mem, 1983 NY Legis Ann, at 363; emphasis supplied). Similarly, the final report submitted by the Committee to the then Chief Administrative Judge stated, *inter alia,* "[b]urgeoning litigation and a chronic shortage of judges make it counterproductive to take up a judge's time in protracted

fact-finding hearings. This is becoming even more compelling with the recent enactment of the law for equitable distributions in divorce proceedings, which requires long accountings of marital assets". Neither of these statements, however, is inconsistent with our conclusion that the compulsory reference in this case was inappropriate. In the first instance, it is undisputed that a Judicial Hearing Officer can hear and determine equitable distribution issues if the parties consent to such a reference (see, CPLR 4317 [a]; 4312). Secondly, if "exceptional" conditions exist, a court may, in its discretion, refer an issue of fact in an equitable distribution action to a Judicial Hearing Officer to hear *and report* to the court on the particular issue without the parties' consent (see, CPLR 4212). The findings of the Judicial Hearing Officer would not be binding on the court; rather, the court, in determining the particular issues, could, in its discretion, either adopt, modify or reject those findings (see, *Rosenfield v Rosenfield,* 272 App Div 547). However, the fact that the Legislature, in enacting the Judicial Hearing Officer program, did not specifically provide that Judicial Hearing Officers could hear *and determine* equitable distribution issues without the parties' consent tends to controvert a conclusion that such authority exists, particularly in view of the fact that within the pre-1962 statutory framework, Official Referees, who were the forerunners of today's Judicial Hearing Officers, were specifically given that authority (see, Judiciary Law former § 116). Thus, while the use of a compulsory reference to a Judicial Hearing Officer to hear and determine issues in an equitable distribution action may be administratively attractive in helping to alleviate the delays and calendar congestion in the State's trial courts, no statutory authority currently exists to permit its utilization at this time.

■ Our determination that the compulsory reference herein was inappropriate does not, however, require a new trial. Upon our review of the record, we are satisfied that "exceptional" conditions exist in this case which would have justified the reference to a Judicial Hearing Officer to hear and report with or without the parties' consent (see, CPLR 4212). Thus, in the absence of authorization to determine, the reference will be deemed as one to hear and report (see, *Sternberg v Sternberg,* 88 AD2d 950). The Judicial Hearing Officer's detailed decision herein clearly satisfies the statutory requirement that a Referee's report set forth findings of fact and conclusions of law (see, CPLR 4320). Accordingly, upon remittitur, the Su-

preme Court, Nassau County, shall make a determination of the issues involved, following submission to it of the Judicial Hearing Officer's report and such motions by the parties to confirm or disaffirm as they deem appropriate.

Our determination herein renders unnecessary any discussion at this time of the remaining issues raised on this appeal.

BROWN, RUBIN and KUNZEMAN, JJ., concur.

Ordered that the judgment is reversed insofar as appealed from, on the law, without costs or disbursements, and the matter is remitted to the Supreme Court, Nassau County, for a de novo determination of the economic issues involved in the parties' equitable distribution action.